[EDITOR'S NOTE: This case is unpublished as indicated by the issuing court.]
MEMORANDUM OF DECISION RE: COMPLAINT FOR DISSOLUTION OF MARRIAGE
The plaintiff wife commenced this action for a dissolution of the parties' marriage on the ground of irretrievable breakdown. The writ and complaint were returnable to this court on November 1, 1994. Thereby, the plaintiff also sought sole custody and support for the minor child who is the sole issue of this marriage, alimony and an equitable division or assignment of family property and income, and other equitable relief. The defendant husband responded with an answer and cross complaint CT Page 11039 under date of November 29, 1994. Thereby, he also claimed an irretrievable breakdown of the parties' marriage, and requested relief by way of joint custody of the minor child, alimony, an equitable distribution of the parties' property, counsel fees and other unspecified relief.
Both parties successfully completed the parenting education program early in the course of the litigation. Nonetheless, the case has been marked by numerous motions and petitions for visitation, custody, evaluation and financial relief submitted by both parties from the commencement of the action, through the time of trial, with responsive interim orders of the court. On February 14, 1996, Judge Barall appointed Atty. Nan Thomson as counsel for the minor child, with "[c]os t/fees [to] be shared equally between the plaintiff and the defendant." Additionally, on that date, Judge Barall appointed Bruce Freedman, Ph.D. to serve as a "psychologist for custody study and/or evaluation" in the matter, with his costs and fees to be shared equally, as well, by the parties.
The parties and the minor child were represented by counsel at trial. Each party testified, and submitted financial affidavits, documentary evidence, proposed orders and thorough memoranda for the consideration of the court. Counsel for the minor child submitted her comments and proposals in writing, with a memorandum supported by extensive research into the literature relevant to the issues of custody and parenting were warranted by the case. While counsel for the minor child was not subjected to cross-examination by the parties, they were provided an opportunity to respond to her opinions through written memoranda.
 I
From the evidence presented at trial, the court finds the following facts, which serve as the basis for its conclusions and orders set forth below:
The parties were married on January 6, 1990 in West Hartford, Connecticut. Each has resided continually in this state since that date. The sole issue of this marriage, Katherine Elizabeth Harris, known as "Katie," was born to the parties on November 17, 1991. The parties lived together until November of 1994, when Katie was three years old. Since that time, they have effectively been separated. CT Page 11040
Karen Harris is thirty-five years old and in excellent health. She is a college graduate and a certified public accountant. She was previously married to Richard Belmont: that marriage was dissolved by court order. The plaintiff now resides in Wallingford, and participates actively in the local Lutheran church. She has introduced her young daughter to weekly worship and church pre-school activities, which have engaged the child's interest and attention.
The plaintiff was previously employed as an accountant at Arthur Anderson, but has been a self-employed accountant for a number of years. In this status, she is currently capable of earning at least $52,000 gross wages per year while she follows a schedule which allows her to work part-time at her employers' or clients' premises, and the remainder of the time at home.[1]
The plaintiff admits that despite her peripatetic work experience in recent years, her skills and experience enable her to find enjoyable, remunerative employment. Because of her current schedule, requiring her to work Monday-Wednesday-Friday except in unusual circumstances, the plaintiff is available to care for Katie after she returns from school in the afternoons on Tuesday and Thursday. On the remaining days, she allows Katie to be cared for by others, incurring an expense of $20 per day, or $40 per week, for child care. The day care provider picks Katie up at school when the plaintiff is working, establishing that the plaintiff has the ability to allow third parties to successfully stand in her stead where Katie's well-being is concerned. Incorporating the "self-employment tax", day care expense and other permissible guidelines deductions, the plaintiff has income of approximately $580 per week for child support purposes.
The plaintiff's retirement accounts, as of December 6, 1996, were valued at approximately $82,000. Her debts included a loan from her father in the amount of $39,000, which had been used for the purchase of her home in Wallingford. This loan was obtained in July of 1995, after commencement of this dissolution proceeding, and was secured by a note dated July 10, 1995. This note ostensibly provided the plaintiff' father with an interest in the plaintiff's retirement accounts, executed in anticipation of the dissolution of her marriage and distribution of marital property. The plaintiff is the sole owner of her single-family home in Wallingford. This property is worth approximately $225,000. It is encumbered by a commercial first mortgage in the amount of $178,000.[2]
CT Page 11041
When the parties married, the plaintiff owned a condominium that she had purchased for $135,000 in 1988. This property was encumbered by a mortgage in the amount of $118,000. The parties jointly agreed to sell this property in 1991 when the plaintiff was pregnant with Katie, so they could procure a new home in which to raise their expected child. The property was sold in August of 1991 at a loss of $25,000.
At the time of the marriage, the plaintiff also maintained approximately $35,000 in retirement accounts and $10,000 in a checking account. She carried $2,000 worth of credit card debt at that time.
In 1992, the parties decided to become residents of 8 Maureen Drive in Simsbury, a home owned by the defendant's grandmother. The property was purchased from her at a below market-rate of $120,000, with ownership vesting in the defendant's name, alone. The parties used a $40,000 down payment for this purchase, consisting of a $16,000 gift from the defendant's parents, $11,000 from their savings, and a $13,000 loan obtained by the plaintiff against her 401k retirement plan. The remainder of the purchase was funded through a mortgage provided by the defendant's grandmother to the defendant. The defendant is the sole obligor on this purchase-money mortgage. The plaintiff is the sole obligor on the 401k loan, and she has consistently made payments against this loan without contribution from the defendant. During the course of the marriage, the parties jointly contributed to approximately $35,000 worth of improvements to the Maureen Drive property.
In June of 1992 the parties obtained a home equity line of credit in the amount of $49,000 from CNB. The plaintiff used and repaid $2,000 of this credit line on one occasion.
Shortly after their move to Simsbury in 1992, the defendant advised her that he was the subject of a paternity claim pursued against him by a former girlfriend. The defendant was sued for paternity in 1993. In March 1994, against legal protest, the defendant was adjudicated the father of a child identified as Ashley Amaio, who had been born prior to Katie, and prior to the parties' marriage. The defendant is lawfully responsible for the care and support of this child pursuant to § 46b-56 and §46b-84. He is subject to orders issued by Judge Barall on March 8, 1994, requiring him to pay current support for Ashley in the amount of $70 per week.[3]
CT Page 11042
The defendant does not maintain any relationship with his daughter Ashley Amaio, notwithstanding the fact that she and her mother live close to the defendant's place of employment. This child is ten years old: the defendant has seen this child only once, by a coincidental meeting.
James Harris is forty-three years old and in good health. He is a college graduate who majored in business studies. He has been employed for many years in automobile sales, most recently as the full-time sales manager at Mitchell Pontiac, Inc. in Simsbury. Traditionally, he has worked on Saturdays, with Friday as his "day off." Additionally, the defendant works until 9:00 pm two days per week. Including commissions on sales and bonus income, he is capable of earning gross annual income of approximately $57,200, or $1,100 per week from this work, yielding a weekly net of $700 available for child support purposes, after appropriate deductions.[4] The defendant persuasively testified concerning the unpredictable nature of his income, which dependent on the success and vicissitudes of the retail automobile market.
The plaintiff is concerned that the defendant's work schedule would require increased child-care by third parties, making him an inappropriate custodial parent. Specifically, because the defendant works on Saturdays, she objects to any visitation protocol that would allow Katie to spend that day with him, or in his care. The defendant satisfied the court that Katie would be welcome at the clean, well-supervised showroom[5] where he works, that the child could benefit from occasional exposure to an environment where individuals are engaged in business, that her safety would be ensured, and that appropriate child care by family members or other responsible persons would be otherwise available. The plaintiff's own testimony, bolstered by the opinions of Dr. Freedman, clearly supports the conclusion that Katie is well-adjusted to baby-sitters: such child care is, in fact, an intrinsic component of the plaintiff's own method of providing custodial care for Katie. Under these circumstances, the court concludes that the defendant's work schedule does not create an insurmountable impediment to increasing his contact with and care for the child.
The defendant's home at 8 Maureen Drive in Simsbury has valid market value of approximately $190,000 based on adequate professional appraisal. The home is encumbered by a first CT Page 11043 mortgage in the amount of $63,000. The defendant maintains retirement accounts in the amount of $6,100. He has additional assets by way of deposits at a Schwab account worth approximately $20,000.
At the time of the marriage the defendant carried a demand loan for $5,000 and $10,000 worth of credit card debt.
Within a few days following Katie's birth in November of 1991, the parties opened a bank account for her with an initial deposit of $520. The account was held by Karen S. Harris as custodian for Katherine Harris. Thereafter, during the course of the marriage, the defendant received approximately $54,000 from his family, by way of a distribution of funds acquired after the sale of a family business. On September 20, 1993, at the defendant's request, the plaintiff deposited these funds into Katie's custodial account. In January 1994, $15,000 was withdrawn from this account to pay capital gains owed as the result of the distribution. On March 14, 1994, at the defendant's request, and following his adjudication as the father of Ashley Amaio, the plaintiff withdrew $39,000 from the custodial account. The defendant used these funds to open a deposit account which he has maintained in his own name.
The paternity proceedings involving Ashley Amaio, their origin, and court resolution caused the plaintiff to feel deceived and distraught, as the defendant was reluctant to face his responsibilities to Ashley. This series of events caused the breakdown of the marriage. Despite the increasing friction between the parties, the defendant refused to vacate 8 Maureen Drive when asked to do so in November 1994. Thereafter, in later 1994 or early 1995, the plaintiff left that house at 8 Maureen Drive, taking Katie with her.
Both parties maintain pleasant, comfortable and esthetically pleasing homes, with more than adequate room for Katie to establish "a room of her own." Each parent has ample yard space, neighborhood playmates, family and school accessibility. While the defendant smokes cigarettes, he is rigorous in his practice of smoking outside the interior spaces of his home, and he is well able to shield his daughter from the potentially harmful effects of cigarette smoking. As well, while the defendant is an avid hunter who possesses certain firearms, he is well able to maintain these weapons and their ammunition in separate locked compartments, exceeding the storage protocol established by law. CT Page 11044 The parties are thus to be commended on their successful efforts at making Katie safe, comfortable and happy when she is at either home.
Following the commencement of defendant's paternity proceedings, the relationship between the parties has been marked by anger, resentment, attempts at retribution, verbal attacks, frustration, and attempts at physical aggression. In 1994 and 1995, the plaintiff prohibited the defendant from overnight visits with his baby. The defendant sincerely feels that the plaintiff moved to Wallingford merely to create difficulties for his visitation with his daughter. On at least one occasion, the defendant has pursued criminal charges against the plaintiff based upon claims of an assault, arising from a slapping incident: these charges were apparently resolved without penalty imposed by the court. The plaintiff reports that the defendant has pursued her in his automobile, placing her in danger. Neither party feels that the other is able to communicate in a reasonable and satisfactory manner concerning the well-being of their child. Counsel for the minor child confirms that the parties fail to relate in a mature matter concerning these issues: through her report and her cross-examination of the plaintiff, Attorney Thomson raised valid concerns about the parties' abilities to successfully comply with anything other than a rigid, explicit parenting plan.[6] The parties have been unable to agree, as well, on more global issues affecting the lifestyle or education of their child. For instance, the plaintiff insists that any satisfactory parenting plan would assure Katie's regular, uninterrupted attendance at the mother's selected weekly religious services, although such a schedule would deprive the defendant of the opportunity to have Katie at his home on Saturday evenings and Sunday mornings without incurring significant travel obligations. Also, because of their lack of cooperation in the decision-making process, and their failure to timely and effectively coordinate exchange of information concerning the available and appropriate school programs for their child, the parties have required the court's involvement in the decisions about where Katie should attend Kindergarten.
Fortunately for all, Judge McWeeny's decision concerning Katie's schooling seems to have provided her with many favorable opportunities. During the 1996-97 school year, at Judge McWeeny's order, Katie attended a pre-kindergarten, or "developmental kindergarten" program at the Rock Hill School in Wallingford. The public school sponsors this program for children who, like Katie, CT Page 11045 are born in the latter third of any calendar year. Katie's kindergarten teacher, a skilled and well-qualified elementary educator testified at trial, and described Katie as a wonderful and delightful child who is happy to come to school. The plaintiff confirms this witness's finding that Katie has made many friends and that she has integrated well into this program. Katie's teacher had observed both parents interactions with their child, and described their relations with Katie as loving and happy. As a result of her year in this program, Katie became ready to participate in the regular kindergarten program at Rock Hill School during the 1997-98 school year, without need for further pre-kindergarten preparation.
A psychological and family evaluation was performed by Bruce Freedman, Ph.D., a licensed psychologist with experience in forensic assessments. Dr. Freedman's first evaluation took place from April 2-17, 1996, resulting in the issuance of a thoroughly documented report on April 24, 1996 (Child's Exhibit 1). Dr. Freedman found that Katie needs the care and attention of both her parents, who stand among the best mothers and fathers he has seen: he testified that both parties possess "superior" parenting skills. The court credits Dr. Freedman's analysis that while the defendant "had been a somewhat irresponsible young man, fathering a child, spending too much time hanging around bars" he has developed into an "affectionate, warm, attentive, sensible, and dedicated" father, who "showed excellent qualities as a potential custodial parent." Child's Exhibit 1, p. 12. In addition, the court credits Dr. Freedman's finding that the plaintiff "showed excellent qualifications as a parent" who "was attentive and devoted to her daughter, was diligent and conscientious in pursuing what she felt was best for her daughter . . ." Child's Exhibit 1, p. 21. In the opinion of Dr. Freedman, both parents demonstrated natural and rewarding interactions with their child. He noted that the plaintiff "showed an excellent, established relationship with Katie. There was closeness and comfort, sustained mutual interest, and mother showed excellent parenting skills." As to the defendant, Dr. Freedman found that he "[h]e showed skills more than sufficient for a level of care of custody from part-time visitor all the way to primary custodian . . . he showed all the qualifications necessary to have cared for [Katie] well." Child's Exhibit 1, p. 24.
While noting the parties' manifest mutual parenting strengths, such as commitment to Katie and ability to provide "sufficient structure and guidance" insofar as discipline or CT Page 11046 behavior management was concerned,[7] Dr. Freedman noted that each parent presents several areas of weakness. He found that the plaintiff "showed a substantial history of obstruction of father's contact, apparently based on an [sic] value and belief system in which she felt entitled to basically take over care and control of Katie as part of the divorce." Child's Exhibit 1, p. 24. In addition, he noted that the plaintiff at times "seemed manipulative, secretive, and less than forthright in the post-divorce negotiations and battles." Child's Exhibit 1, p. 26. On the other hand, he found the defendant to be "more lax and at times sloppy in his personal life" with specific reference to the birth of his elder child. Id.
At conclusion of this initial interview, Dr. Freedman concluded that maximum use of the parenting talents of each party should be utilized when formulating a parenting plan, notwithstanding the geographical distance that separates Katie's parents. He resolved that "[i]deally, Katie would spend roughly half of her weekday, weekend, holiday and vacation time with each parent. . . . Moving the child substantially in the direction of either parent would deprive her of the resources, attention, and care she needed from both parents." Child's Exhibit 1, p. 25-27. Dr. Freedman recommended joint custody and a shared parentingplan which accommodated the distance between the parties' homes, the defendant's work schedule, and "the difficulty these two parents have in getting along with each other." Child's Exhibit 1, p. 27. He concluded this report by noting that "[i]t would be hoped that a spirit of cooperation, or co-parenting, and of facilitation could be developed between the two parents. Without such an atmosphere, Katie would be likely to suffer psychologically, and many routine parenting tasks made difficult for both parents. An essential change required for this would be for mother to move from viewing herself as being in charge and entitled to make the important decisions for Katie. If necessary, personal counseling might assist mother in this process." Id.
Dr. Freedman's accolade for the parents' care, concern, and attention to their daughter continued unabated through his "Psychological Evaluation — Update" dated December 12 1996, which was based upon interviews of the parents that had been conducted approximately two weeks earlier. (Child's Exhibit 21.) In this report, Dr. Freedman noted that both mother and father "continued to be loving devoted parents. Both had much to offer, and any plan which did not maximize their parental resources would be to Katie's detriment." (Child's Exhibit 21, 7.) Dr. CT Page 11047 Freedman concluded that Katie "was easy going and enjoyed both of her parents" under the existing custody/visitation circumstances; (Child's Exhibit 2, 9.); and that she had become and remained "strongly attached to both parents." Id., 7. However, Dr. Freedman rescinded his support for a shared parenting arrangement, due to the distance between the two family homes, and the "styles" of the two parents which he found to be "extremely incompatible."[8] On this date, Dr. Freedman "recommended that Katie Harris spend a majority of time living in her father's home", attending school in his town and afforded visitation with her mother who would move her residence closer to that of the defendant. (Child's Exhibit 2, 8-9.)
Dr. Freedman evaluated the parties again on February 20, 1997. Revisiting his earlier recommendations, he noted that "the plan proposed by this psychologist in the [December] evaluation would require mother to move, and the child to be wrenched fromher closest relationship making this relationship a more secondary one. . . . While father's care, his manner with the child, his town, and child care arrangements would all be good, mother's were probably superior in most dimensions. . . . It is therefore recommended that the plan agreed to before Judge McWeeny (sic) be essentially continued. This would mean that the parents would exercise joint custody, that the child would have primary residence with the mother, that father would have liberal visiting." (Child's Exhibit 3, 2-3.) This "final" opinion was supported by Dr. Freedman's trial testimony. He acknowledged that the plaintiff's deeply religious nature and her over-conscientiousness, could result in actions that appear as attempts to obstruct the father's relationship with Katie, because he does not manifest the plaintiff's personal ethos and behaviors. Such personality traits are well within normal limits, in Dr. Freedman's opinion, although they may pose a challenge for a co-parent. Dr. Freedman remains "tremendously" impressed with the plaintiff's character and will to succeed, just as he finds the defendant to represent "the dream father for a child." Id. The defendant's relaxed demeanor and accepting nature, in fact, should make him well-adapted to meeting the rigid expectations of the plaintiff with regard to visitation schedules. The court accepts Dr. Freedman's assessment that no mental health intervention is needed for either party at this time.
Counsel for the minor child conducted extensive observations of the parents, of the minor child, and the environments to which they would expose Katie if custody were granted to them. Katie's CT Page 11048 counsel participated vigorously at trial through examination and cross-examination of witnesses. She submitted a lengthy and thorough set of recommendations for Katie's placement as the result of her work in this case, her skill and experience in such matters.[9] Noting the agreement of Katie's parents on the single issue of joint custody, Attorney Thomson noted: "Fortunately, the parents of my client now agree that Joint Custody is desired, despite their misgivings of each other. I am requesting that the Court award the parties Joint Legal Custody." Proposal, 2.
As do the parties, counsel for the minor child reports that Katie now presents herself as a "great, well a adjusted and flexible child." Id. "She is a resilient child who does not "require a lot of discipline or limit setting . . . [and who] evidenced a tolerance for disappointment and imperfection" even at her young age. Id., 3. The court notes the significance of the fact that Katie has developed these salutary personality and developmental characteristics while she has been residing with her mother, subject to her mother's scheduling and social protocols, and visiting with her father on a regular, anticipated and periodic basis. While counsel for the minor child opines that the plaintiff "is here seeking disproportionate power, control and time with [her] client"; Id., 4; the court is obligated to conclude that Katie has thrived, intellectually and emotionally, under exactly that regimen which Ms. Thomson urges the court to deconstruct at this time. Counsel for the minor child has recommended that the court "order that the Father at all times not only be in strict compliance with any applicable gun [safety and storage] laws, but that the use of the [gun] safe be mandatory." Id., 13. She further recommends that while Katie "should not have to be subject to becoming victim to secondhand smoke," her father's custom of smoking cigarettes outside his home, but inside the screened-in porch, should be permitted to continue. Id., 14.
Counsel for the minor child has indicated that a shared parenting plan should be considered by the court, notwithstanding her opinion that the plaintiff mother has difficulty separating herself from the child; Id., 21; and despite her conclusion that "the parent that has caused the significant conflict(s) at exchanges has been the Mother." Id., 22. She recommends that the defendant father be named the "primary residential parent" in the event the court cannot adopt a conventional shared parenting plan. Id., 18. She attributes this position to the findings made CT Page 11049 by Dr. Freedman in his final report in this matter. (Child's Exhibit 1.) Upon this foundation, she concludes that "Mr. Harris has been identified as having a better ability to co-parent and tolerate the involvement of the other parent." (Proposal, 18.) In so concluding, counsel for the minor child apparently credits Dr. Freedman's earliest opinion, while discrediting his final position, through which he adopted Judge McWeeny's pendente lite orders, assigning joint custody to the parties, with Katie's primary residence with the plaintiff, and liberal visitation for the defendant." (Child's Exhibit 3, 2-3.)
Counsel for the minor child has concluded that this case does not deserve classification as "`high conflict' as it is typically defined." (Proposal, 22.) However, she recommends a mediation order, which would require the parties to consult a private or public mediator before utilizing the court for hearing of motions to enforce or modify existing orders. In addition, she urges the court so "clearly set forth a rigid, default plan which will need to be followed if the parents cannot agree" on issues related to visitation and transfer of the child from one party to another. Id., 23. The court finds that this case indeed presents itself as a "high conflict" matter.
The plaintiff is concerned that any extended opportunity for the defendant to care for his daughter would unnecessarily involve excessive automobile travel. The court finds that as both parents are financially stable, making adequate incomes, they would not be unduly burdened by the cost of travel from one home to the other. The court further finds that both parents are commendably committed to and skilled at their professions, and recognizes their need for attention to work-related issues even while providing child care. Thus, the opportunity each would have to enjoy Katie's company during car travel from and to visits with the other parent, free of interruption or intrusion by professional obligations, television or radio, could provide very valuable parenting time, indeed. Accordingly, the court does not find that the travel between the plaintiff's home in Wallingford and the defendant's home in Simsbury creates any significant issue to be addressed when deciding custody or visitation issues.
The parties have stipulated that the marriage has broken down irretrievably. The court finds that the parties' communication skills are each less developed on the home front than they are at the workplace, where each obviously successful in relating complex data and to effectively work with other adults. The court CT Page 11050 finds that the breakdown of this marriage was due to the parties' mutual failure to use their inherent communication skills when facing marital problems. Neither the plaintiff's friendship with a former employer, nor the defendant's failure to acknowledge his parental obligations to his child from a prior union, can be identified as the sole or fundamental cause of the parties' difficulties. Rather, equivalent anger, lack of forthrightness and mistrust on the part of each caused the marriage to fail.
 II A
In reaching its decision, the court has considered all of the requisite statutory criteria, together with the equitable and taxable consequences of the financial awards set forth below.
The court applied the principles of General Statutes §46b-81 (a) in considering this case. That statute provides that "[a]t the time of entering a decree annulling or dissolving a marriage . . . the superior court may assign to either the husband or wife all or part of the estate of the other." The court also applied those factors set forth in § 46b-81 (c), which it must consider in dividing the marital estate, including: the causes for the dissolution of the marriage, the age and health of the parties, their station and occupation, amount and sources of income, employability, vocational skills, estate, liabilities, needs and opportunity for future acquisition of capital assets and income. The court shall also consider the contribution of each of the parties in the acquisition, preservation appreciation in value of their respective estates." § 46b-81 (c). The court further considered those corollary factors contained in Sec. 46b-82 in determining whether alimony should be awarded to either party.
In reaching its decisions concerning support of the minor child, the court observed the maxim that its paramount concern is directed at serving the best interests of the child. See, e.g.,Hall v. Hall, 186 Conn. 118, 121-122 (1982). In entering its support orders, the court considered the tax implications for the parties, the applicable common law, and the Child Support and Arrearage Guidelines enacted pursuant to § 46b-215a of the Connecticut General Statutes. The court also followed the appropriate statutory criteria. (General Statutes § 46b-56c
requires that "[i]n determining whether a child is in need of CT Page 11051 support and, if in need, the respective abilities of the parents to provide support, the court shall take into consideration all of the factors enumerated in § 46b-84." Those factors include: "the age, health, station, occupation, earning capacity, amount and sources of income, estate, vocational skills and employability of each of the parents, and the age, health, station, occupation, educational status and expectation, amount and sources of income, vocational skills, employability, estate and needs of the child." § 46b-84 (c).
In addressing financial issues, each party urged the court to use a mechanistic model, based on the parties' exact financial contributions to their marital assets and debts, to "trace" the share of those extant assets to which each is now entitled, and to assign responsibility for accumulated debt. The court has declined the opportunity to utilize this approach in meeting its obligation pursuant to § 46b-81. No evidence was presented trial from which the court could determine applicable discount and/or inflation rates for use in evaluating the parties' acquisition of marital assets, or participation in indebtedness during the course of their marriage. Furthermore, the use of such models is discourage in like cases. "`In family matters, the court exercises its equitable powers. The balancing of equities is a matter which falls within the discretion of the trial court. . . . For that reason, equitable remedies are not bound by formula but are molded to the needs of justice. . . .'" (Internal and external citations omitted.) Oneglia v. Oneglia,14 Conn. App. 267, 271-272 (1988).
Accordingly, the court has evaluated each party's claims to marital property, tangible and intangible, including property which has been held jointly or singly during the course of the marriage, or in which each has a current interest. The court has considered, as noted above, the assets which each brought to the marriage, and each party's use of assets during the marriage. The court concludes that each party has equivalent opportunities for acquisition of capital assets or income.
 B
The issue of placement during child development has been the subject of much study by professionals concerned with custody in divorce proceedings. In 1993, the National Council of Juvenile and Family Court Judges published Child Development: A Judge'sReference Guide, which sets forth many of the fundamental CT Page 11052 principles upon which state courts may rely in formulating parenting plans and deciding custody issues.[10] Drs. Ian Russ and Martin Stein remind us that "[s]everal developmental characteristics of the child must be considered when creating a custody agreement for young children: Consistency; Transition between parents; Child's concept of time; Peer relationships." Id., in "Developmental Issues in Custody Decisions", 25. The authors focus their concerns, and direct the court's attention, to critical areas of concern in evaluating custody issues:"Caring, consistency and time are the essential ingredients for the development of healthy emotional attachment and trust. These factors emerge as the environmental foundation of healthy growth. Consistency of environment, including people, places and rules, is necessary for the child to move through each stage of development successfully. Too many changes interfere with the child's ability to feel emotionally safe and to trust others. When deciding custody arrangements, it is essential, when possible, to keep children in the same location and close to the same adults for as long as possible. Constant disruptions intrude upon the child's ability to master the developmental tasks of life." (Boldface in the original) Id., 25-26. The authors conclude with a stern caution to judges who are denied the opportunity to impose a "shared parenting" plan because of the parties' continued contention and disagreement over custody issues: "The plans that work the best are ones in which the child's needs are central and the parents are willing to make it work with a minimum of anger and resentment. A custody plan that places the child's needs as central will be detrimental to the child if the parents continue to fight and use the child as an instrument of their anger. Other than clarifying this reality to the families or suggesting psychotherapy to help the parents work out post-divorce anger, there is little a judge can do when parents are committed to fighting around the children. . . ." Id., 27-28.
Counsel for the minor child submitted a number of exhibits that were of great assistance to the court in formulating the appropriate custody and visitation plans for the Harris family. The court appreciates counsel's reference to the existence of "some evidence that children tend to adjust better after a divorce when they live with the same sexed parent (Peterson 
Zill, 1986; Santrock Warshak, 1979; Zill, 1988). While sex of the parent is usually not a criterion in determining custody, this research indicates that sex of the child and parent may be important factors to consider in determining the custodial CT Page 11053 arrangement." J. Bray, "Psychosocial Factors Affecting Custodial and Visitation Arrangements," Behavioral Sciences and the Law, Vol. 9, 419-437 (1991). This position is corroborated by the findings made by the parties in this case, by Dr. Freedman and other witnesses, that the minor child at issue, who is a female, is doing very well despite the stressors caused by her parents' separation, while she lives with her mother, who is the "same sexed parent" under the circumstances of this case. Id. Dr. Bray also reminds us that "[c]ontinuity in care, home, and social milieu are central concerns for children (Rutter, 1989) and are of particular importance in the post-divorce family (Clingempeel Repucci, 1982; Hetherington et al., 1989)." Id. The court has accordingly utilized these principles as factors for consideration in designing the parenting plan for Katie's benefit.
Counsel for the minor child has also provided support for a parenting plan that would permit each party to remain actively and effectively involved in the process of raising their child. Through Child's Exhibit 3, she has raised the issue of a "parallel parenting" plan, which differs in concept from either shared custody, as that protocol is used in the Connecticut family courts, or co-parenting. F. Salka and L. Margolin, "In Support of Parallel Parenting." The authors have identified a type of parenting plan that may be particularly effective when the court must address custody claims raised by parties who have well-matched sets of strengths and weaknesses insofar as their child-rearing skills are concerned, but where, as here, the parties also demonstrate a rancorous relationship and a persistent need to disagree, rather than to agree, concerning the best interests of their child. "Parallel parenting is different than `co-parenting.' Co-parenting implies that, although divorced, two parents work together in the rearing of their children, which, in turn, implies that they discuss and agree upon lifestyle decisions. Parallel parenting, on the other hand, recognizes that there are many parents who can't agree on the time of day, but who, nevertheless, can and should contribute to the raising of their children. This can be accomplished simply by permitting each parent to raise his or her child during his or her time with the child, without interference from the other parent or the courts. In other words, where there is no abuse orneglect, a parent should be free to raise children in anatmosphere of privacy." (Emphasis in the original.) Id. The parties have presented no evidence whatsoever from which the court could conclude that Katie has been either abused or CT Page 11054 neglected by her parents: to the contrary, the facts of this case reveal that despite the continuing parental discord, each loves and cherishes this child in an age-appropriate and healthy way. Katie's case, then, presents an appropriate case for imposition of a "parallel parenting" plan such as that recommended by the child's attorney.
The final article submitted as an exhibit by Katie's counsel again supports the application of "parallel parenting" to this case. In "Psychological Issues in Custody Decisions"; Child's Exhibit 4; Dr. Samuel Roll reminds us "that in the vast majority of cases, both parents are fit" and provided a reasonable psychological "fit" with the child's own personality and behaviors. Id. Roll focuses on the subject of "attachment", which "is the summary term for the various types of emotional relationships between a child and a parent . . . which gives the child a sense of relationship with, or belonging to that other person. . . . It is the level of attachment to a person that will determine the degree of loss the child will feel if the person is taken away from him. It is the level of attachment to a person that gives that person the capacity to be of comfort, reassurance, and security to the child. With few exceptions, the recommendation in the best interest of the child is that the child should be in the custody of the person to whom the child has the greatest degree of psychological attachment." Id. Roll and his colleagues have authored a testing instrument which they recommend for use in helping the court to make custody decisions: in his three evaluations, In this case, Dr. Freedman examined only the parties, not the child, and no evidence has been presented from which the court can conclude how Katie would score on the Parent Attachment Test. Id. While conceding that the use of this specific test is not critical, Roll emphasizes that the issue of attachment is critical when making custody decisions. "Very likely, both research and clinical experience will continue to highlight the importance in attachment (and the loss of attachment figures) in personality development. The court has previously noted Dr. Freedman's conclusion that Katie is "strongly attached to both parents," and credits this opinion, although recognizing that it was derived not from objective models, but from interviews with the parties in the absence of this child.
With the evidence adduced at trial, this information leads the court to conclude that each party possesses a distinct parenting style, one being primarily authoritative and the other CT Page 11055 being primarily permissive, with each recognized as being effective as far as Katie Harris is concerned. It falls to the court to determine what parenting plan can be devised that will enhance Katie's exposure to each of these parenting styles, while maintaining the child's current salutary level of stability. The commentators have identified the overwhelming benefits of utilizing both parents as role-models where each parent has valuable attributes to for the child to assimilate. "Practically everyone who has studied contemporary families agrees that to be effective as growth environments, they must embody two processes that seem to be in opposition to each other, and that parents often find difficult to reconcile. . . . Family sociologists have called these two processes the instrumental and theexpressive, and have pointed out that parents must teach their children practical coping skills, while at the same time they must make them feel emotionally secure and attached to society. . . . Other researchers have focused on authority and permissiveness as the poles of the dialectic, and found the optimal context in the authoritative family, which combines the necessary features of both authoritarian and permissive ones, without having the latter's shortcomings." (Footnotes omitted; emphasis in the original.) M. Csikszentmihalyi, "Contexts of Optimal Growth in Childhood," 122 Daedalus: Journal of the American Academy of Arts and Sciences, 31, (1993). In Katie's case, while she cannot live with both parents at the same; time, the court concludes that maximizing her exposure to each will best ensure maximization of Katie's potential to enjoy life and to contribute to her community. "To achieve trust, autonomy, initiative, and industry children need to be securely attached emotionally so that they can take on the risks implicit in growing up. At the same time, they need to be challenged by goals that are worth pursuing. Children who are fortunate to experience such contexts are likely to enjoy their lives, while at the same time contributing to the common good." Id., 44.
In the absence of the Parent Attachment Test or other psychological examination which can model and communicate Katie's most significant "attachment", the court must rely upon other evidence of this subject. The critical nature of identifying and responding to the "attachment" issues for Katie require close attention. Almost twenty years ago, David Elkind noted that separation from a parent to whom a child is attached "can overload children emotionally with distress, fears (that the parent will never return), and anxieties (maybe the child caused the parent to leave). Parents are the most important people in CT Page 11056 the world to their children and separation is a very powerful stressor." D. Elkind, "The Hurried Child: Growing Up Too Fast Too Soon," (1981) p. 152.
Addressing the attachment issue to his own advantage, the defendant protests that the court has "no other choice than to accept Attorney Thomson's recommendations" when deciding the custody issues raised in this case. Defendant's Trial Memorandum and Proposed Orders, dated May 29, 1997, 5-6. (Hereinafter, Defendant's Memorandum.) If this argument were accepted, the findings and recommendation of counsel for the minor child would be improperly substituted for the findings and opinion of the court. The role of guardian and counsel for the minor child has been admirably served by Atty. Thomson in this case. She has patiently and persistently attempted to assuage the parties' lack of agreement concerning the fundamental custodial issues. However, adoption of the defendant's position would effectively deprive the court of its obligation to fairly and impartially examine the parties, their evidence, and their arguments, including the arguments and positions proposed by counsel for the minor child, and would vitiate the court's responsibility to impose such orders as are expressly contemplated through §46b-56. This section provides: "(a) In any controversy before the Superior Court as to the custody and care of minor children . . . the court may at any time make or modify any proper order regarding the education and support of the children and of care, custody and visitation. . . . Subject to the provisions of section 46b-56a [presumption of joint custody] the court may assign the custody of any child to the parents jointly, to either parent or to a third party, according to its best judgment uponthe acts of the case and subject to such conditions andlimitations as it deems equitable . . . (b) In making or modifying any order with respect to custody or visitation, thecourt shall (1) be guided by the best interests of the child,
giving consideration to the wishes of the child if the child is of sufficient age and capable of forming an intelligent preference, provided in making the initial order the court may take into consideration the causes for dissolution of themarriage . . . if such causes are relevant in a determination ofthe best interests of the child. . . ." § 46b-56.
Dr. Freedman indicated his agreement with counsel for the minor child, establishing that both parents should be closely involved in Katie's life. He opined, however, that the Katie's current school and residential environments are meeting her needs CT Page 11057 without need for modification. Dr. Freedman found that Katie's enrollment in the Rock Hill Elementary School program had provided sufficient structure and relaxation opportunities for her to achieve success at school. Her home life with her mother, complemented by visits to her father, has resulted in the development of a happy and healthy child. Dr. Freedman found that Katie would be well able to adjust to any visitation schedule that would assign Sunday visitation to the defendant, although this might interfere with the plaintiff's plans for Katie's religious and social structure. The doctor emphasized that, in his opinion, the plaintiff was capable of, and would indeed follow any order of the court. Accordingly, Dr. Freedman's concluding recommendation, albeit in opposition to that parenting plan proposed by Katie's counsel, was for joint parental custody, with primary residence in Wallingford with the plaintiff. Dr. Freedman urged, in view of Katie's age, that the defendant be provided alternate weekend visitation, with one weekday evening visitation, as well.
It is important to emphasize that even the defendant has concluded that under the current residential arrangements, with Katie living primarily at her mother's house in Wallingford, the child is functioning very, very well. In the defendant's own words, he finds Katie to be "relaxed" and "happy" during visits with him. Like all the other adults who provided testimony at trial, the defendant finds Katie to be a happy, well-adjusted child and primary school student.
Under the circumstances of this case, the court finds that the parties absolute inability to trust each other, and their persistent fear and disapprobation of the other's personality and lifestyle, have formed not only the basis for the breakdown, or the "dissolution," of their marriage, but the basis for imposing a rigid parenting schedule. Despite their inherently superb parenting qualities, despite their mutual adoration for and commitment to their daughter, the parties' extraordinarily limited ability to communicate concerning the child and her well-being makes them inappropriate candidates for a conventional shared parenting plan. Accordingly, the court has assumed the obligation of determining which parent shall has primary residential care and responsibility for Katie, while the other is provided frequent and liberal visitation to enhance the non-custodial parent's role in Katie's young life.
The parties stipulated that $195 per hour would be a fair and CT Page 11058 reasonable rate for the services required by the plaintiff's attorney in this matter.[11] They further stipulated that $175 per hour would be a fair and reasonable rate for the services required by the child's attorney in this case. The court finds that the parties have equally used the court system to obtain relief, through the filing of multiple, complex motions which have required intensive preparation and presentation by their counsel.
 III ORDERS
Wherefore, the court finds that the allegations of the parties complaints have been proved to be true; that it has jurisdiction over the matter; that the marriage has broken down irretrievably with equal fault attributed to each party. Accordingly, the marriage of the parties is hereby dissolved, and the following orders shall enter:
CUSTODY
a. The parties shall have joint legal custody of the minor child, with primary physical residence to be with the plaintiff during the school year, and primary residence to be with the defendant during the summer school recess period, as further defined in the parenting plan set forth below.
b. Either party who causes, allows or permits firearms and/or ammunition to be within any residence or structure which may be occupied by the minor child during custody or visitation shall require that such firearms and any ammunition be stored in separate locked stationery containers.
c. Neither party may smoke cigarettes inside any residence or structure which may be occupied by the minor child during custody or visitation, nor may either party cause, allow or permit any other person to so smoke cigarettes, except that the defendant may smoke within the screened porch which abuts his home.
d. The court notes that each party has completed the parenting education program sponsored by the judicial department. The court reinforces the lessons of that program by ordering the parties to refrain from making any negative or derogatory remarks about the other parent in the presence of the child, or under CT Page 11059 such circumstances as may cause the child to learn of such remarks. The parties are ordered to accord each other the respect and courtesy that they expect their child to demonstrate to them and to other family members.
e. Each party must fully comply with the parenting plan set forth below, so that the minor child may rely on the schedule of visits with each party. If either party perceives that the other has failed to fully comply with this parenting plan, the parties must participate in a program of professional or court-annexed mediation before the hearing of any further related issue before the court. The parties are to share equally in the cost of such mediation proceedings.
PARENTING PLAN
A. During the school year: Katie shall reside primarily with her mother. She shall spend the following time periods with her father, with transportation to be provided by the parent to whom responsibility for Katie's care is to be transferred according to this schedule.
 1. First and Third Saturday mornings with father from Saturday morning from 9:00 am until Sunday evenings at 7:00 pm.
 2. In any month that has a fifth Saturday, with father Saturday morning from 9:00 am until Sunday evening at 7:00 pm.
 3. Wednesdays with father from the completion of school or Katie's after-school activities until 7:30 pm.
 4. February school vacations in even-numbered years, with father from 9:00 am Saturday morning at the commencement of the vacation until 7:00 pm Saturday evening at the conclusion of the vacation.
 5. April school vacations in odd-numbered years, with father from 9:00 am Saturday morning at the commencement of the vacation until 7:00 pm Saturday evening at the conclusion of the vacation.
B. For the holidays listed below, the following schedule shall CT Page 11060 supersede and supplant any of the above-described regular visitation time of either parent. Transportation is to be provided by the parent to whom responsibility for Katie's case is to be transferred according to this schedule.
 1. Thanksgiving: With mother from 9:00 am Thursday morning (Thanksgiving Day) until 5:00 pm the following Sunday in even-numbered years; and with father for like time periods in odd-numbered years.
 2. Christmas Eve: In odd-numbered years, with father from 4:00 pm on December 23 or the last day of school preceding the Christmas holiday, whichever is later, until 11:30 am on Christmas Day; and with mother for like time periods in even numbered years.
 3. Christmas Day: In odd-numbered years with mother from 11:30 am until 7:30 pm on December 25; and with father for like time periods in even-numbered years.
 4. Christmas school holiday including New Year's Eve and Day: In each even-numbered year, with mother from 7:30 pm on December 25 through 7:30 pm on December 29; and with father for like time periods in odd numbered years. In each even-numbered year, with father from 7:30 pm on December 29 through 5:00 pm on January 1; and with mother for like time periods in odd-numbered years.
 5. Maundy Thursday/Good Friday/Easter: In even-numbered years, with father from 5:00 pm after school on Thursday until 6:30 pm on Easter Sunday; with mother for like time periods in odd-numbered years.
 6. One-day holidays: The following visitation schedule shall apply to all one-day holidays listed below. On each occasion, visitation shall be from 5:00 pm the evening before the holiday until 7:00 pm on the evening of the holiday.
 Martin Luther King Day: Mother in odd-numbered years; father in even-numbered years. CT Page 11061
 President's Day: Mother in even-numbered years; father in odd-numbered years. Note: if this holiday falls within or adjacent to a February School Vacation, as described above, the vacation schedule shall pre-empt the one-day holiday schedule.
 Mother's Day: Always with Mother.
Father's Day: Always with Father.
 Independence Day (July 4th): Mother in odd-numbered years; father in even-numbered years: Note: if this holiday falls within or adjacent to a Summer Vacation as set forth below, the summer vacation schedule shall preempt the one-day schedule.
 Columbus Day: Mother in even-numbered years; father in odd-numbered years.
 Veteran's Day: Mother in odd-numbered years; father in even-numbered years.
 7. Weekend Holidays: The following visitation schedule shall apply to all weekend holidays listed below. On each occasion, visitation shall be from 9:00 am Saturday morning immediately preceding the holiday until 7:00 pm on the evening of the holiday (Monday):
 Memorial Day Weekend: Mother in even-numbered years; father in odd-numbered years.
 Labor Day Weekend: Mother in odd-numbered years; father in even-numbered years.
8. Birthdays:
 Mother's Birthday: If she does not otherwise have visitation scheduled for this date, Mother shall be allowed to have the child with her from 5:00 pm to 7:00 pm on Mother's birthday. Mother shall provide all transportation related to this CT Page 11062 visitation.
 Father's Birthday: If he does not otherwise have visitation scheduled for this date, father shall be allowed to have the child with him from 5:00 pm to 7:00 pm on Father's birthday. Father shall provide all transportation related to this visitation.
 Katie's Birthday: If either parent does not otherwise have visitation scheduled for this date, he or she shall be allowed to have the child with him or her from 5:00 pm to 7:00 pm on Katie's birthday. The visiting parent shall provide all required transportation.
C. During the child's Summer School Vacation, Katie shall reside primarily with her father. She shall spend the following time periods with her mother, with transportation to be provided by the parent to whom responsibility for Katie's care is to be transferred according to this schedule.
 1. First and Third Saturday mornings with mother from 9:00 am until Sunday evenings at 7:00 pm.
 2. In any one month that has a fifth Saturday, with mother Saturday morning from 9:00 am until Sunday evening at 7:00 pm.
 3. Tuesdays and Thursdays with mother from the completion of camp or summer school activities until 7:30 pm.
 4. In addition, each parent is to have two vacation weeks with Katie during each summer, from 7:00 pm on Sunday night through 7:00 pm the following Friday night, so long as these vacation weeks do not interfere with Katie's scheduled summer camp or summer-school activities, as Katie's peer-group activities shall take precedence to the parents' vacation schedules. The defendant father is to provide the plaintiff mother with notice concerning Katie's planned summer school and/or camp activities no later than April 1st of each year. The parties shall notify each other not later than CT Page 11063 April 30 of each year of the two weeks each wishes to spend alone with Katie. Those weeks may be consecutive. In the event of a conflict regarding these elections, the defendant's choices shall prevail in even-numbered years, and the mother's choices shall prevail in odd-numbered years.
CHILD SUPPORT
a. The court was not provided with information from which it could determine what portion of the parties' health care insurance premiums are attributable to Katie, or to Ashley Amaio. Given a net family income of $1280 per week, after deductions for child care and prior-support obligations, the guidelines require a total of $259 to be available for Katie's support.
b. During the school year, when the minor child resides primarily with the plaintiff according to the parenting schedule as set forth above, the defendant shall pay to the plaintiff $135 per week. This figure falls within the statutory allowance for minimal deviation from the strict guidelines allotment.
c. During the summer months, when the minor child resides primarily with the defendant according to the parenting schedule as set forth above, the plaintiff shall pay to the defendant $100 per week. This figure falls within the statutory allowance for minimal deviation from the strict guidelines allotment.
d. The parties shall share equally in the cost of any summer camp or summer school programs in which Ashley is enrolled. The defendant shall be allowed no further deduction for child care expenses during the summer period when he serves as the primary residential parent. The plaintiff shall not be further burdened by a deduction in her child support allotment during the summer period, given her greater responsibilities during the school year when the child resides primarily with her.
e. Each party shall be responsible for the cost of miscellaneous lessons, such as dance or sports activities, that the child enjoys during his or her primary custodial period.
HEALTH CARE INSURANCE.
The defendant shall maintain the child as a covered dependent on his job-related health insurance, and he shall pay the premium CT Page 11064 therefore. An order pursuant to General Statutes § 46b-84 (d) shall enter. The child's health care shall be obtained through providers who are covered by this health insurance, so long as the child's well-being is not endangered through this procedure. The parties shall each pay one-half of the unreimbursed or uncovered health care expenses for the child including, but not limited to, costs for medical, dental, pharmaceutical, orthodontic, mental health and/or optical costs. Costs of applicable insurance "deductibles" shall be shared equally, as well, by the parties. Any party who seeks reimbursement under this paragraph shall provide the other parent with a copy of the bill or invoice for unreimbursed health care costs within thirty days of receiving said bill or invoice. The other parent shall provide direct payment to the health care provider, or shall reimburse the expending parent where applicable, immediately upon receipt of this copy.
LIFE INSURANCE
The parties are each ordered to maintain at least Two Hundred Thousand ($200,000.00) Dollars worth of life insurance on their respective lives with the minor child being the irrevocable beneficiary of such policy during her minority.
ATTORNEY'S FEES
a. As for the parties' attorney's fees, the court notes the defendant's claim that the plaintiff is solely responsible for the tortuous path of this litigation. He asserts: "[t]o state that this matter has been overlitigated is an incredible understatement." Defendant's Memorandum, 2, 6. As noted, however, the court has found that the parties have equally accessed the court system. Furthermore, each party earns a substantial income and has significant earning capacity as noted above. Accordingly, the court declines the opportunity to award attorneys' fees to either party under the circumstances of this case consistent with the principles of Sec. 46b-62.
b. As to the fees incurred by counsel for the minor child, the court orders that the parties continue to be responsible, in equal shares, for any and all fees for the services of Atty. Thomson to Katie.
ALIMONY
CT Page 11065
Despite his initial claim for alimony, the defendant has rescinded this request. In view of the parties substantial incomes, significant earning capacities, and the distribution of property ordered herein, the court adopts and applies the defendant's suggestion that "no order on account of alimony enter." Defendant's Memorandum, 6.
TAX EXEMPTION
The parties shall alternate the years in which each is entitled to claim the child as an exemption on his or her federal and state income tax returns. The defendant shall have the privilege of claiming Katie's dependency in odd-numbered years and the plaintiff shall have this privilege in even-numbered years.
PERSONAL PROPERTY
The parties have divided the majority of their personal property contained at 8 Maureen Drive. Within 30 days from entry of this judgment, the defendant shall provide to the plaintiff each of the items identified on Schedule A of the plaintiff's Claims for Relief dated December 3, 1996. The plaintiff shall be permitted reasonable access to the paved surfaces of the defendant's property for purposes of retrieving these items. If any item is not available, within 30 days from the entry of this judgment, the defendant shall provide a notarized affidavit stating that he has made earnest efforts to locate the requested items, specifying the date(s) on which these efforts were made, and the last location, if any, at which he knew each item to be located.
AUTOMOBILES
The parties shall retain the possession and/or ownership of the automobiles currently shown on their respective financial affidavits.
REAL ESTATE
a. The plaintiff wife will retain all of her right, title and interest in real property located at 12 Nutmeg Court, in Wallingford, Connecticut, subject to all of the costs and expenses attendant to the ownership and maintenance of this property. The plaintiff will indemnify and hold the defendant CT Page 11066 harmless from any obligations she may have concerning this property or debt which it has been used to secure.
b. The defendant husband will retain all of his right, title and interest in the real property located at 8 Maureen Drive in Simsbury, Connecticut, subject to all of the costs and expenses attendant to the ownership and maintenance of this property. The defendant will indemnify and hold the defendant harmless from any obligations he may have concerning this property or debt which is has been used to secure.
DEBTS
a. Each party will be responsible for the satisfaction and payments of all debts listed on their respective financial affidavits, and will indemnify and hold each other harmless to the same.
b. In addition, to redress the plaintiff wife's losses from loans obtained against her 401k plan, the proceeds of which loans were used in large part for the down payment on the home at 8 Maureen Drive in Simsbury, the defendant shall reimburse her the sum of $8,000 by payments of $150 per month, payable on the 15th of each month, commencing December 15, 1997, and continuing until this amount has been satisfied in full. The plaintiff shall be entitled to simple annual interest which accrues at the statutory rate for any amounts which remain unpaid as of the date due. The parties must participate in a program of professional or court-annexed mediation before the hearing of any further related issue before the court. The parties are to share equally in the cost of such mediation proceedings.
DIVISION OF REMAINING ASSETS
a. Each party shall be permitted to retain such portion of his or her retirement or deferred-compensation accounts which remains unexpended as of the date of this order, without further claim by the other party to any distribution from that account.
b. Recognizing the significantly greater equity retained by the defendant in the property at 8 Maureen Drive, but acknowledging the family-based transaction that led to the parties' inhabitance of this house, and recognizing that the plaintiff has elected to work only three days per week while caring for Katie during her early childhood, with concomitant CT Page 11067 minimization of the family's day care costs, the court requires the defendant to provide the plaintiff with a distribution of assets which will make equitable their accumulation and dissipation of property during the course of the marriage. Accordingly, the court orders the defendant to pay the plaintiff a total of $35,000 to achieve this goal. The defendant shall make payments to the plaintiff in the amount of $2,500 on each of the following dates in each of the following four fiscal quarters of each year (January 15th, March 15th, June 15th and September 15th), commencing January 15th 1998, until this debt is satisfied in full. The plaintiff shall be entitled to simple annual interest which accrues at the statutory rate for any amounts which remain unpaid as of the date due. The parties must participate in a program of professional or court-annexed mediation before the hearing of any further related issue before the court. The parties are to share equally in the cost of such mediation proceedings
BY THE COURT, N. Rubinow, J.